ORIGINAL



**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| GALLIT FISCHMAN, Individually, | § § § | |
| Plaintiff, | § § § | **3-26Cv1882-K** |
| v. | § § | Civil Action No. _____ |
| NOVARTIS PHARMACEUTICALS CORPORATION, | § § § | |
| Defendant. | § § | |

FILED

JUN − 5 2026

CLERK, U.S. DISTRICT COURT

By _____ JJF

Deputy

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

## I. NATURE OF THE ACTION

1.  This civil action arises from the death of Dov Fischman, a heart-transplant recipient who died on January 6, 2025, after being converted from a stable, decade-long immunosuppressive regimen to everolimus, a drug Defendant Novartis Pharmaceuticals Corporation created, brought to market, and promoted for transplant use. Dov Fischman had lived for nearly nine years after his 2015 heart transplant with no documented rejection and no clinical need to change his regimen. Within approximately one month after everolimus was introduced, he developed immune collapse, post-transplant lymphoproliferative disorder manifesting as Hodgkin's lymphoma, severe infection, and fatal sepsis. Plaintiff Gallit Fischman, his adult daughter, brings this action solely in

her individual capacity as a statutory wrongful-death beneficiary. She does not assert any survival claim or seek damages belonging to any estate.

2. This case is not about the physical manufacture of the generic tablet dispensed to Dov Fischman or about second-guessing a prescribing physician's clinical judgment. Plaintiff seeks to hold Defendant liable for its own upstream conduct: the architecture of everolimus's warning structure, the marketplace narrative through which Defendant positioned everolimus for heart-transplant conversion use, and Defendant's control over the risk-disclosure framework that governed how everolimus was understood by prescribers and patients, including the prescribing environment in which Dov Fischman was treated.

3. Defendant's liability arises from converging and independent lines of conduct. Defendant held or controlled the New Drug Application and reference labeling for both Zortress®/everolimus and Neoral®/cyclosporine modified, placing it in a uniquely asymmetric position: it sold Dov Fischman cyclosporine-based immunosuppression for approximately nine years, had visibility into its long-term clinical profile, and then promoted the drug that displaced it. Everolimus is a minimally modified derivative of sirolimus, differing only in pharmacokinetics while leaving the mTOR-inhibition mechanism intact. It entered the U.S. transplant market after a $490.9 million federal enforcement resolution involving sirolimus for the same category of off-label transplant-conversion promotion, and Plaintiff alleges Defendant advanced everolimus as a commercial reset of that strategy. Defendant also used three brand identities, Zortress® for U.S. transplant use, Afinitor® for oncology, and Certican® for non-U.S. heart-transplant markets, in a way that allowed the Certican® heart-transplant approval narrative to migrate into the U.S. prescribing environment while Zortress®'s restrictive U.S. warning was de-emphasized.

4. Defendant's warning and risk-communication framework failed heart-transplant patients at every level. The Black Box Warning framed the mortality and infection risk around *de novo* transplant patients in a way that foreseeably made the warning appear inapplicable to stable patients converted years later, and a reviewing physician confirmed that reading after Dov Fischman's death. The remainder of the insert gave kidney- and liver-transplant patients a complete adverse-event profile, dosing guidance, and monitoring framework that heart-transplant patients never received. Defendant had the regulatory authority to fill that gap through label changes, Dear Healthcare Provider letters, or supplemental prescriber documentation, and did not. Defendant also disseminated misleading benefit narratives: the kidney-sparing story falsely credited everolimus with a renal benefit that came entirely from reducing cyclosporine, a goal achievable with approved alternatives, while the CMV narrative failed to address what happens when antiviral prophylaxis is removed from a high-risk patient at conversion, which is precisely what occurred with Dov Fischman. Defendant advanced these narratives while providing no dosing guide, transition protocol, or monitoring schedule for off-label heart-transplant conversion use. When Dov Fischman deteriorated after everolimus was discontinued, Defendant's fragmented risk framework made it harder for his treating physicians to recognize everolimus as the cause, delaying the clinical response that might have saved his life.

5. Plaintiff brings separate and alternative Texas-law claims for wrongful death, unreasonably dangerous product, failure to warn, negligence, gross negligence, and violations of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41–63.

## II. PARTIES

6.  Plaintiff Gallit Fischman is a citizen of Texas and resides at 10114 Deermont Trail, Dallas, Texas 75243. She is the adult daughter of Dov Fischman, deceased, and brings this action solely in her individual capacity as a statutory wrongful death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. She does not purport to represent, bind, waive, release, adjudicate, or recover on behalf of any nonparty beneficiary.

7.  Plaintiff alleges that the other statutory wrongful death beneficiaries are aware of this action and will not be joining. Their non-participation does not impair Plaintiff's individual wrongful-death claim or subject Defendant to inconsistent obligations.

8.  Decedent Dov Fischman was a resident of Dallas County, Texas at all times relevant to this action and received the treatment at issue within this District.

9.  Defendant Novartis Pharmaceuticals Corporation is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Health Plaza, East Hanover, New Jersey 07936-1080. Defendant manufactures, labels, and distributes pharmaceutical products throughout the United States, including in Texas. Defendant holds or controls the New Drug Application and reference labeling for Zortress®/everolimus and Neoral®/cyclosporine modified. Defendant may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### III. JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Texas. Defendant is a citizen of Delaware and New Jersey. The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

11.   This Court has personal jurisdiction over Defendant, which conducts pharmaceutical business in Texas, markets and distributes pharmaceutical products for use by Texas patients, and whose product conduct gave rise to the claims alleged here within this District.

12.   Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to this action occurred here, including the prescription, administration, and resulting injuries.

## IV.  CONDITIONS PRECEDENT

13.   All conditions precedent applicable to Plaintiff's DTPA claim have been satisfied. On February 20, 2026, Plaintiff provided written pre-suit notice to Defendant under Tex. Bus. & Com. Code § 17.505 by certified mail, return receipt requested, through Defendant's Texas registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. The notice identified Plaintiff's consumer-protection complaint in reasonable detail and stated the economic damages, mental-anguish damages, and expenses claimed. The sixty-day statutory waiting period has expired. To the extent any other claim requires a condition precedent, Plaintiff alleges that all such applicable conditions have been performed or have occurred.

## V.  MANUFACTURER LIABILITY AND CHAPTER 74 NON-APPLICABILITY

14.   The gravamen of Plaintiff's claims is Defendant's own conduct as a pharmaceutical manufacturer and NDA holder, not medical malpractice. Defendant is not a physician, health care provider, or health care institution within the meaning of Tex. Civ. Prac. & Rem. Code § 74.001. Plaintiff does not allege treatment, lack of treatment, or any clinical duty owed by a physician. These claims fall outside Chapter 74.

15.   Plaintiff's wrongful-death theory does not require Defendant to be the sole contributor to Dov Fischman's injuries and death. Defendant's warning, labeling, and risk-communication

framework placed everolimus into the transplant prescribing environment and was a producing and proximate cause of Dov Fischman's exposure and death, even if responsibility is later allocated among other responsible parties under Texas law. Defendant cannot avoid liability for its own communications, omissions, and risk framework by pointing to later decisions made within the everolimus narrative Defendant allegedly created. *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140 (Tex. 2012).

16.    After his April 14, 2015 heart transplant, Dov Fischman obtained and used transplant immunosuppressive pharmaceutical goods for his direct personal medical use, including Defendant's branded Neoral® as part of his long-term maintenance care. That relationship continued for approximately nine years. His medication records reflect that Neoral® was designated "Brand Medically Necessary," meaning Defendant's specific branded product was required for his care and establishing a direct consumer relationship with Defendant as manufacturer. He was a consumer within the meaning of the DTPA and a foreseeable end user for Plaintiff's products-liability and negligence theories. The DTPA does not require direct contractual privity where the consumer sought or acquired goods forming the basis of the complaint. *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983); *Kennedy v. Sale*, 689 S.W.2d 890, 892–93 (Tex. 1985).

17.    Everolimus was supplied to Dov Fischman through a medication-access or patient-assistance channel whose records, terms, participants, and risk disclosures have not been produced. Defendant's 2024–2025 NPAF Policy Change confirms that Defendant operated a patient-assistance infrastructure covering relevant transplant medications, including Neoral® and Zortress®, and that both were removed from that program effective January 1, 2025, six days before Dov Fischman's death. No signed informed-consent document authorizing non-approved

heart-transplant use of everolimus has been produced to Plaintiff. Plaintiff alleges that any Defendant-controlled omission or misrepresentation in the access process occurred in connection with the consumer transaction at issue and supports DTPA liability.

18.   The drug dispensed to Dov Fischman was generic everolimus, but generic substitution did not sever Defendant's responsibility for Zortress® and its generic warning framework or the everolimus transplant-market narrative. Under the federal generic-drug framework, an ANDA applicant must use labeling that is the same as the approved labeling for the listed drug, except for limited permissible differences. Defendant therefore controlled the reference-labeling framework that generic everolimus products were required to follow. Generic manufacturers are generally preempted from independently changing that labeling. *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013). Plaintiff does not seek to hold Defendant liable for physically manufacturing the generic tablet Dov Fischman received. Plaintiff seeks to hold Defendant liable for its own control over Zortress® and its generic warning framework and the transplant-market narrative built on it.

19.   Plaintiff seeks discovery into Defendant's everolimus-related institutional materials and relationships, including any data-sharing relationship with UT Southwestern Medical Center, any use or retention of information derived from Dov Fischman's immunosuppressant care, and any medication-transition or clinical-outcome data. Plaintiff also seeks discovery into TEAMMATE-connected materials to the extent they involved Defendant or the labeling and prescriber-notification framework applicable to everolimus. TEAMMATE (NCT03386539) was a clinical trial involving everolimus-based immunosuppression at institutions connected to Dov Fischman's transplant care, and any Defendant involvement in that trial's design, data, prescriber

communications, or risk-disclosure framework is relevant to Defendant's knowledge of everolimus risks and its connection to the prescribing environment at issue.

## VI. FACTUAL ALLEGATIONS

### A. Dov Fischman: Nine Years of Stability

20. Dov Fischman underwent a heart transplant on April 14, 2015, after developing heart failure caused by prior chemotherapy. For approximately nine years afterward, he remained stable on a cyclosporine-based immunosuppressive regimen anchored by Defendant's branded Neoral® and generic azathioprine, with no documented rejection.

21. Transplant immunosuppression requires balance: enough suppression to prevent rejection, but not so much that immune function cannot defend against infection and malignancy. Dov Fischman's cyclosporine-based regimen maintained that balance for nearly a decade by targeting rejection pathways, not broadly disabling the immune system as everolimus did. Before everolimus, he never experienced rejection or any unmanageable adverse effect.

22. He was also a patient with a specific vulnerability: his original heart failure stemmed from chemotherapy-related cardiac injury. The drug that would be introduced to alter his stable regimen (everolimus) is the same active compound Defendant markets as Afinitor® for oncology, where mTOR inhibition is the mechanism used to interfere with cellular growth and proliferation. That convergence was not incidental. It was a known pharmacologic risk that Defendant's market narrative obscured.

### B. The May 2024 Conversion and What Followed

23. In May 2024, Dov Fischman's regimen was changed. Azathioprine was removed, everolimus was added, and cyclosporine was continued at a reduced dose. This was the tradeoff

Defendant's marketplace narrative had positioned as a modern, kidney-protective upgrade to CNI-based maintenance therapy.

24. Within approximately one month, Dov Fischman experienced a drastic clinical decline. He developed systemic immune dysfunction, post-transplant lymphoproliferative disorder manifesting as Hodgkin's lymphoma, severe infection, and sepsis. Sepsis was the immediate cause of death, as reflected in his treatment course and medical record. None of these conditions had presented before everolimus was introduced.

25. The harms that followed matched the dangers Defendant's own labeling identified for heart-transplant everolimus use (increased mortality often associated with serious infection), yet Defendant's marketplace conduct had made those risks appear remote, inapplicable, or outweighed by purported benefits. Dov Fischman died on January 6, 2025.

26. Plaintiff further alleges that Defendant's fragmented risk framework made the cause of Dov Fischman's decline harder to recognize in real time. After everolimus was discontinued, he continued to decline for approximately five months. The absence of a clear, complete heart-transplant risk framework prevented his treating physicians from timely identifying everolimus exposure as the cause or a contributing cause of his immune collapse, delaying or foreclosing the clinical response that might have changed his outcome.

## C. The Heart-Transplant Warning Gap

27. Everolimus (Zortress®) was FDA-approved for prophylaxis of organ rejection in certain adult kidney- and liver-transplant patients only. Heart-transplant immunosuppression was not an approved indication. The label provided dosing, patient-selection, monitoring, and benefit-

risk guidance for kidney and liver recipients, but no equivalent framework for heart-transplant patients.

28.    The Zortress® prescribing insert was internally inconsistent in a way that foreseeably undermined the warning it purported to give. The front-page summary stated, without qualification, that use in heart transplantation was not recommended. The detailed Boxed Warning then tied that statement to a clinical trial involving *de novo* heart-transplant patients, creating an opening to argue that the warning applied only to newly transplanted patients and not to stable patients converted years later. Plaintiff alleges on information and belief that post-hoc review of Dov Fischman's case relied on that opening. Defendant structured that inconsistency into the label and is responsible for what it produced. See Exhibit A.

29.    The remainder of the insert was structured for kidney- and liver-transplant patients. It identified serious and potentially fatal risks associated with everolimus exposure, including infection, sepsis, post-transplant lymphoproliferative disorder, malignancy, impaired wound healing, pulmonary toxicity, and nephrotoxicity. A heart-transplant patient or prescriber received a mortality warning at the top, followed by a detailed risk profile organized around different patient populations. The heart-transplant-specific risks were not assembled, contextualized, or presented as a coherent clinical picture for that patient class.

30.    That structural gap was itself a failure of Defendant's duty as NDA holder and manufacturer. The Black Box Warning gave heart-transplant patients a mortality signal with no supported dosing framework, patient-selection criteria, monitoring protocol, adverse-event profile, antiviral-management guidance, or benefit-risk assessment for that population. Once Defendant knew, or should have known, that heart-transplant everolimus use involved additional material risks not captured by that warning, Defendant had a responsibility to update or strengthen the

warning framework so it presented a complete and non-misleading heart-transplant risk profile. Defendant had the regulatory mechanism to expand or clarify the warning under 21 C.F.R. §§ 201.57(c)(1) and 314.70(c)(6)(iii)(A), and the ability to distribute supplemental prescriber documentation addressing the risks of everolimus in stable heart-transplant recipients. Defendant used none of those mechanisms to give heart-transplant patients and prescribers the complete risk profile they needed.

31.  Plaintiff does not allege that the Black Box Warning was absent. Plaintiff alleges that Defendant structured the warning in a way that foreseeably stripped it of practical force for the exact population at risk: stable heart-transplant patients converted to everolimus years after transplantation. The warning's *de novo* framing gave prescribers a textual basis to read the mortality signal as inapplicable to converted patients, and the remainder of the insert provided no compensating heart-transplant risk profile to close that gap.

32.  That reading occurred in practice. Plaintiff alleges on information and belief that physicians reviewing Dov Fischman's case after his death relied on the *de novo* wording to conclude that everolimus use was medically justifiable, reasoning that the Black Box Warning applied to newly transplanted patients and not to a stable patient converted years after transplantation. Plaintiff further alleges that this reading was not idiosyncratic, but the foreseeable consequence of a labeling structure whose summary warned broadly against heart-transplant use while its detailed explanation invited a narrower reading. Defendant cannot control the language that made the warning appear limited, decline to fill the gap with a complete heart-transplant risk profile, and then disclaim responsibility when that limitation was used to justify the exact conversion the warning was meant to prevent.

33. As NDA holder and manufacturer, Defendant was responsible for maintaining labeling that reflected material safety information as it developed, including the authority to add or strengthen warnings based on newly acquired information under 21 C.F.R. §§ 201.57(c)(6) and 314.70(c)(6)(iii)(A). Post-approval heart-transplant use, study activity, and Defendant's own market-facing conduct made converted heart-transplant recipients a real-world everolimus population. Defendant had both the mechanism and the obligation to provide a complete heart-transplant risk profile, either in the labeling or through supplemental prescriber communication. It did neither. Plaintiff alleges that Defendant cannot help create or normalize a converted-patient population and then rely on the absence of an FDA-approved heart-transplant framework to avoid responsibility for the risks that population faced.

**D. Off-Label Promotion and Market Normalization**

34. On information and belief, Defendant materially advanced everolimus use in heart-transplant patients despite the absence of FDA approval for that indication. Defendant used transplant materials, publications, study-related activity, and market-facing risk communications to present everolimus as a viable heart-transplant conversion option, normalizing that use despite the warning gap and the heightened risk created when a stable CNI-based regimen was displaced.

35. Off-label prescribing by physicians and off-label promotion by manufacturers are different. Physicians may prescribe approved drugs off-label. Manufacturers may not promote, normalize, or materially advance unapproved uses while failing to give full practical force to the associated risk framework. FDA guidance recognizes that communications about unapproved uses require safeguards so prescribers can evaluate the strengths, weaknesses, and clinical utility of the information conveyed. The FDCA prohibits introducing or delivering misbranded drugs into

interstate commerce and introducing drugs in violation of FDA approval requirements. 21 U.S.C. §§ 331(a), 331(d), 355(a).

36. When a manufacturer normalizes, promotes, or materially advances an off-label use, it cannot then disclaim responsibility for the clinical framework that use requires. Defendant may argue that heart-transplant conversion was off-label and therefore outside any obligation to provide complete prescribing guidance. Plaintiff alleges that Defendant's own marketplace conduct created that obligation. If Defendant was going to advance non-approved heart-transplant use of everolimus, it had to provide the infrastructure needed to evaluate and carry out that use responsibly. Defendant provided none: no heart-transplant prescribing guide, no starting-dose or titration protocol, no transition framework, no monitoring schedule, no patient-selection criteria, no guidance identifying which clinical rationales could justify conversion, and no discontinuation criteria when infection, malignancy, immune collapse, or other warning signs appeared.

37. Plaintiff alleges that this absence of clinical infrastructure was especially dangerous. Everolimus conversion in a stable heart-transplant patient was not a routine medication adjustment; it was a fundamental change to the immunosuppressive backbone of a patient whose immune balance had been calibrated over years. The prescribing physician was left to navigate that change through a kidney- and liver-transplant insert, a Black Box Warning that appeared limited to *de novo* cases, and benefit narratives that omitted the complete risk picture. In Dov Fischman's case, Plaintiff alleges that this missing framework was reflected in an approximately one-month monitoring gap after everolimus was introduced, despite the heightened risk created by altering his immunosuppression. Defendant created the market conditions that made the conversion appear clinically supported while leaving prescribers without the tools needed to carry

it out safely. That is not independent off-label prescribing. It is a manufacturer advancing a use it would not support with the documentation that use required.

38. Defendant's market-facing conduct created a public information environment in which heart-transplant everolimus use appeared normalized, clinically supported, and available as a conversion strategy. On information and belief, Defendant's study registrations, publication activity, and transplant communications contributed to that environment. Plaintiff has identified public clinical-trial records and transplant literature associated with Defendant or Defendant-linked everolimus research addressing heart-transplant use; a representative pre-filing capture is attached as Exhibit C as corroborating context, not as the sole evidentiary basis. Plaintiff alleges that the visibility of those materials made heart-transplant conversion appear to be a supported clinical pathway rather than an unapproved use lacking a complete risk framework. Discovery will establish the full scope of Defendant's heart-transplant market conduct.

39. That normalization mattered directly to Dov Fischman's care. His conversion occurred within a prescribing environment shaped by Defendant's market conduct. Defendant cannot use the prescribing pathway as the vehicle through which its everolimus narrative reached patients, and then disclaim responsibility for prescribing decisions that pathway produced.

### E. Brand Conflation and Warning Dilution

40. Defendant did not consistently anchor its transplant messaging to the United States brand name Zortress®. Instead, Defendant used the shared drug name "everolimus," even though that name covered different brands, different approvals, and different warning frameworks.

41. That distinction mattered. Zortress® was the United States transplant brand. It was approved for kidney- and liver-transplant rejection prophylaxis only, and its label warned that

heart-transplant use was not recommended. Certican® was Defendant's European and non-U.S. transplant brand. In multiple non-U.S. markets, Certican® carried a heart-transplant approval or indication. Afinitor® was Defendant's oncology brand for the same active drug. Defendant therefore controlled three everolimus narratives at the same time: a United States transplant label that warned against heart-transplant use, a non-U.S. transplant narrative in which everolimus appeared approved for heart-transplant use, and an oncology identity that was not clearly disclosed in the U.S. transplant framing.

42. By centering the market narrative on "everolimus," Defendant blurred those critical distinctions. The shared drug name allowed Certican®'s heart-transplant approval narrative to migrate into the United States prescribing environment while Zortress®'s restrictive warning lost force. It also allowed everolimus's oncology identity to recede from the transplant framing. Plaintiff alleges that this was not a harmless naming issue. It made everolimus appear more accepted, more approved, and more clinically supported for heart-transplant conversion than the United States Zortress® label allowed.

43. Defendant's later removal of both Afinitor® and Zortress® from its patient-assistance program reinforces this pattern. Defendant treated everolimus through a shared drug identity while moving away from brand-specific risk distinctions. That made everolimus appear accepted across use pathways while the message to United States heart-transplant patients was no longer anchored to the Zortress® warning. A true and correct copy of Defendant's 2024–2025 NPAF Policy Change is attached as Exhibit B. Plaintiff alleges that this brand conflation misrepresented everolimus's characteristics and approval significance in the United States market under Tex. Bus. & Com. Code §§ 17.46(b)(5) and (7), and diluted the Zortress® heart-transplant warning in the prescribing environment.

## F. The Misleading Benefit Narratives

44. Defendant did not present everolimus as merely another transplant immunosuppressant. It positioned everolimus as a safer, more modern, and clinically superior alternative to established CNI-based maintenance therapy, including the cyclosporine-based regimen that had kept Dov Fischman stable for nine years. Defendant controlled the transplant-drug narratives for both Neoral® and Zortress®, giving it asymmetric knowledge of the long-term clinical profile of cyclosporine-based maintenance and the risk profile of everolimus conversion. Plaintiff alleges that Defendant used that knowledge to favor everolimus conversion while diminishing the perceived clinical value of the therapy it had sold Dov Fischman for years.

45. Defendant's study and publication environment emphasized three purported benefits: **renal protection, cardiac-allograft vasculopathy (CAV) reduction**, and **CMV-related outcomes**. Each narrative was incomplete or misleading in a way that materially affected how conversion risk was perceived.

46. The **renal-protection** narrative was materially misleading. Kidney burden is a foreseeable vulnerability in long-term transplant care, and Defendant allegedly used that vulnerability to construct a market story in which cyclosporine was the kidney problem and everolimus was the solution. But the claimed renal benefit did not come from anything everolimus independently does to protect kidney function. It came from reducing cyclosporine exposure. Defendant credited everolimus with a benefit that belonged to lowering another drug.

47. The deception went beyond attribution. If the clinical goal was reducing cyclosporine's kidney burden, that goal could have been pursued by reducing cyclosporine itself or pairing a lower cyclosporine dose with approved, established immunosuppressants such as mycophenolate mofetil, azathioprine, or a dose-adjusted CNI. Plaintiff alleges there was no

pharmacologic basis requiring everolimus specifically. The kidney-protection goal did not require introducing an mTOR inhibitor. It required less cyclosporine. Defendant packaged a cyclosporine-reduction benefit as an everolimus benefit and used a clinical goal other approved drugs could have served to market a drug those alternatives would not have required.

48.    That substitution was especially indefensible given what everolimus is. Everolimus is not pharmacologically novel relative to sirolimus, the active drug in Rapamune®. It is a chemical derivative modified by adding a 2-hydroxyethyl chain at position 40, a change that affected absorption and persistence but did not change the mTOR-inhibition mechanism responsible for immune suppression and interference with cellular growth. Plaintiff alleges that everolimus acts on the immune system in a manner materially similar to sirolimus, with adjusted pharmacokinetics. Defendant marketed it as a transplant innovation even though its fundamental immune-system effect remained materially similar to a drug already pursued by the federal government for unlawful off-label promotion in the same transplant-conversion context.

49.    Dov Fischman's own history shows why that narrative mattered. His kidney fluctuations had been managed for years through cyclosporine dose adjustment within the CNI pathway, without introducing a new drug. Newer calcineurin inhibitors, such as voclosporin, further show that kidney burden can be addressed while staying within the established CNI framework. Plaintiff alleges that Defendant's kidney-sparing narrative functioned as marketing rather than an independent clinical finding: Defendant identified a common transplant vulnerability, attributed relief to everolimus rather than cyclosporine reduction, and used that benefit story to displace approved, tolerated, long-term immunosuppression with an oncology-lineage mTOR inhibitor carrying a heart-transplant mortality warning. That strategy required hiding what the benefit actually was, and that omission was material.

50. The **CAV-reduction** narrative was incomplete. CAV is a slow-developing transplant complication, and statin therapy is widely recognized in post-heart-transplant CAV prevention and management. Any claimed CAV benefit attributed to everolimus did not answer the core safety question: whether a stable heart-transplant patient should be converted from tolerated, long-term CNI-based therapy to broader mTOR-based immunosuppression, with the immediate risks of immune collapse, serious infection, malignancy, and death that Defendant's own labeling identified.

51. The **CMV-related-outcomes** narrative was especially misleading as applied to Dov Fischman. He was CMV-seronegative and had received a CMV-seropositive donor heart, placing him in a high-risk category for CMV-related complications. He had been maintained on Valcyte®/valganciclovir for antiviral protection until immediately before everolimus was prescribed. That coverage was removed at the same time he was moved into broader mTOR-based immunosuppression. Defendant's study environment presented CMV-related outcomes as a benefit of switching to everolimus, yet did not clearly address the materially different risk created when antiviral prophylaxis is removed from a high-risk heart-transplant patient at conversion. Published literature evaluated early everolimus conversion combined with valganciclovir prophylaxis to prevent CMV infection in heart-transplant recipients. Defendant's labeling and risk framework did not clearly address what happens when that prophylaxis is removed.

52. Plaintiff further alleges that Defendant's benefit narratives omitted other mTOR-related risks material to heart-transplant conversion. Published literature connects long-term mTOR-inhibitor exposure to muscle wasting and disruption of mitochondrial integrity in cardiomyocytes, the heart-muscle cells responsible for contraction, leading to mitochondrial fragmentation and metabolic dysfunction. Those risks mattered to a heart-transplant patient

converted from stable maintenance therapy, yet Defendant's market narrative emphasized selected benefits while failing to present the broader mTOR risk profile needed to evaluate whether conversion was justified.

### G. Cancer-Drug Framing and the mTOR Reality

53. Defendant controlled the public and clinical categorization of everolimus across its brands. Defendant chose to market everolimus as a "targeted cancer therapy," not as chemotherapy, making the drug appear more precise and less systemically destructive. But everolimus produced a chemotherapy-comparable systemic consequence: it interfered with cellular growth and proliferation by inhibiting mTOR, a pathway that controls how cells divide and multiply. Plaintiff alleges that this distinction was narrow in the way that mattered here: everolimus disrupted the body's ability to generate and maintain cells, including immune cells needed to fight infection and suppress abnormal cell growth. By positioning everolimus as targeted and precise rather than as a drug with chemotherapy-comparable systemic effects, Defendant softened its perceived danger and created the conditions for moving the same active drug into transplant immunosuppression while obscuring its systemic consequences.

54. That positioning had direct consequences for Dov Fischman and constituted a material omission in the transplant-risk framework. The drug introduced to alter his regimen was the same active compound Defendant used in oncology to interfere with cellular growth, yet the Zortress® transplant information did not clearly disclose that dual identity or the chemotherapy-comparable systemic effects it carried. A heart-transplant patient and prescriber evaluating conversion needed to know that everolimus was not merely a modern rejection-control drug, but an oncology-lineage mTOR inhibitor capable of weakening the cellular defenses needed to fight infection and detect abnormal cell growth. That warning was especially material for a patient whose original heart

failure was caused by chemotherapy-related injury, yet the transplant-risk framework did not identify prior chemotherapy-related cardiac injury as a patient-selection factor requiring heightened caution before everolimus conversion. Plaintiff alleges that adding everolimus while reducing cyclosporine made an oncology-lineage drug central to Dov Fischman's immunosuppression, making the conversion especially dangerous in his clinical context.

### H. mTOR Lineage and Prior Enforcement

55.    Everolimus is not a pharmacologically novel compound. It is a chemical derivative of sirolimus, created by adding a single 2-hydroxyethyl chain at position 40 of the sirolimus molecule. That modification did not alter the drug's mechanism of action; it primarily affected how quickly everolimus is absorbed and how long it remains in the body. The mTOR-inhibition pathway, the mechanism by which the drug suppresses immune function and interferes with cellular growth and proliferation, is materially the same pathway used by sirolimus. In every pharmacologically meaningful sense relevant here, everolimus and sirolimus act on the immune system through materially similar mechanisms. Defendant brought this minimally differentiated compound to the transplant market and positioned it as a modern clinical advance, while its fundamental action remained materially similar to its predecessor.

56.    In 2013, the U.S. Department of Justice announced a $490.9 million civil and criminal resolution involving Wyeth Pharmaceuticals, then a Pfizer subsidiary, for unlawful off-label promotion of Rapamune, including conversion use, meaning switching patients from another immunosuppressant to Rapamune for uses not approved by FDA as safe and effective. See Exhibit D. Plaintiff pleads that history as product-lineage, knowledge, and marketplace context, not as character evidence or as a predicate for any government-fraud theory. The fact that Wyeth and Pfizer were the direct targets of the Rapamune resolution does not make the enforcement history

irrelevant. What matters is that the resolution placed the pharmaceutical industry on notice that mTOR-based transplant-conversion promotion carried serious legal and clinical risk, and Defendant allegedly entered the market afterward using a pharmacologically similar mTOR-inhibition mechanism, a new brand identity, and the same conversion strategy. Plaintiff does not allege that Defendant inherited liability from Wyeth or Pfizer. Plaintiff alleges that Defendant adopted and advanced the same playbook after the risk had already been exposed. That conduct supports the inference that everolimus represented a commercial reset of the same strategy rather than a clinically distinct therapeutic advance, and supports Plaintiff's gross-negligence allegations and rebuttal of any labeling presumption under Tex. Civ. Prac. & Rem. Code § 82.007(b)(3).

## I. Patient-Assistance Removal and Drug-Safety Questions

57. In August 2024, Defendant decided to remove both Afinitor® and Zortress® from its Novartis Patient Assistance Foundation program, effective January 1, 2025, six days before Dov Fischman's death. Plaintiff alleges that removing the U.S. oncology and transplant everolimus brands from the same access program reinforces Defendant's treatment of everolimus as a shared drug identity rather than separate brands with separate risk meanings. That change is relevant to Defendant's knowledge, risk communication, and safety assessment.

58. The specific access channel through which Dov Fischman received generic everolimus has not been fully identified, and Plaintiff does not presently have complete records showing who controlled that channel or what product and safety information accompanied the drug. Plaintiff alleges in the alternative that the Neoral® consumer relationship described above is independently sufficient to establish DTPA consumer standing, and that any Novartis-controlled or Novartis-affiliated everolimus access pathway also forms part of the consumer transaction at issue. Plaintiff seeks discovery into Defendant's role in that access channel, including any

Defendant-controlled omission or misrepresentation in the access process. The uncertainty reflects the absence of records, not the absence of a consumer relationship.

### J. Adverse-Event Reporting and Causation Suppression

59.   As NDA holder for Zortress®, Defendant had continuing safety-reporting obligations concerning adverse drug experiences, including duties to maintain adverse-event records and report qualifying information to FDA. 21 C.F.R. § 314.80. Plaintiff alleges that Defendant's risk-dampening narrative affected not only prescribing, but also whether later harms were recognized and reported as everolimus-related adverse events.

60.   When a manufacturer softens or fragments the risk presentation, physicians may fail to connect immune collapse, PTLD, severe infection, and death to the drug exposure that caused or contributed to them. Plaintiff alleges that occurred here. After everolimus was discontinued, Dov Fischman continued to decline for approximately five months. The absence of a clear everolimus risk-recognition framework prevented his treating physicians from timely recognizing everolimus as the cause or contributing cause of his immune collapse, foreclosing the clinical response that might have changed the outcome before the injury progressed to fatal sepsis. The prescribing physicians were research-oriented physicians familiar with everolimus and its study environment, but they were not the physicians managing Dov Fischman's deterioration. The later treating physicians lacked the drug-specific information, warning context, and clinical safeguards needed to recognize mTOR-related immune collapse. Defendant's narrative reached the research-oriented prescribing environment, but its warnings and safeguards did not equip the broader care team responsible for recognizing and responding to the harm after exposure. A clear and complete risk framework also would have made the decline more likely to be reported through FDA adverse-

event channels and transplant-safety pathways, helping prevent similar harm to other heart-transplant patients.

### K. Evidence Control and Discovery Need

61. Critical evidence remains within Defendant's possession, custody, or control, including internal safety analyses, postmarketing adverse-event information, commercialization materials, access-channel records, institutional communications, data-sharing materials, TEAMMATE-connected materials, and everolimus prescriber communications. Plaintiff conducted substantial pre-filing investigation through public materials, regulatory records, published literature, and market-facing sources, but discovery is necessary to determine Defendant's full knowledge, strategy, and connection to Dov Fischman's medication transition and outcome. The filing of this Complaint gives Defendant notice to preserve all documents, data, communications, and electronically stored information potentially relevant to the claims and defenses in this action.

62. Plaintiff pleads these allegations collectively and in the alternative and invokes the discovery rule. Defendant's upstream role and contribution to Dov Fischman's injuries and death were not reasonably apparent at the time of death. The connection between Defendant's risk-disclosure conduct, heart-transplant benefit narratives, 2024–2025 patient-assistance change, and Dov Fischman's post-conversion collapse became apparent only after substantial investigation.

## VII. CAUSES OF ACTION

### COUNT ONE: WRONGFUL DEATH

*Tex. Civ. Prac. & Rem. Code §§ 71.001–71.011*

63. Plaintiff incorporates all preceding paragraphs. Plaintiff brings this wrongful-death claim individually as Dov Fischman's daughter and statutory beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. Plaintiff does not assert a survival claim or seek estate damages.

64. Defendant's wrongful conduct was a producing and proximate cause of Dov Fischman's death. Defendant controlled the warning framework and marketplace narrative for everolimus, structured that framework so the heart-transplant mortality warning foreseeably lost practical force for stable converted patients, and advanced heart-transplant conversion use without the prescribing guide, transition protocol, dosing framework, or monitoring schedule needed to make that use safe. Defendant also promoted conversion through a misleading kidney-sparing narrative that obscured why everolimus was being selected and what approved alternatives could have served the same stated goal. That conduct reached the prescribing environment in which Dov Fischman was treated. A reviewing physician later concluded the Black Box Warning did not apply to him, reasoning that he was a stable converted patient rather than a *de novo* one. That conclusion was the interpretation Defendant's warning structure made available and confirms the foreseeability of the same warning failure that operated before the May 2024 conversion. Within approximately one month after that conversion, Dov Fischman developed immune collapse, PTLD manifesting as Hodgkin's lymphoma, severe infection, and sepsis. He died on January 6, 2025. Defendant's upstream conduct materially contributed to each link in that chain.

65. Plaintiff is entitled to recover all wrongful-death damages permitted under Texas law in her individual capacity as a statutory beneficiary, including loss of companionship, mental anguish, and pecuniary losses sustained as a result of Dov Fischman's death.

## COUNT TWO: STRICT PRODUCTS LIABILITY — UNREASONABLY DANGEROUS PRODUCT

66. Plaintiff incorporates all preceding paragraphs. Plaintiff asserts this count based on Defendant's warning, labeling, and marketplace conduct. Plaintiff does not assert a manufacturing-defect claim based on the physical generic tablet dispensed to Dov Fischman, and Plaintiff does not assert a design-defect claim requiring proof of a safer alternative drug design.

67. Everolimus was unreasonably dangerous as marketed and warned. Defendant released it into the heart-transplant prescribing environment without the warning and risk-communication infrastructure safe use required. The product defect was structural: the insert gave kidney- and liver-transplant patients a complete adverse-event profile, dosing guidance, patient-selection criteria, and monitoring framework, while giving heart-transplant patients only a mortality signal whose *de novo* framing made it appear inapplicable to stable converted patients. That incomplete and misleading risk architecture, combined with Defendant's off-label promotion and benefit narratives, including the kidney-sparing story that falsely credited everolimus with a benefit produced by reducing cyclosporine, made the product unreasonably dangerous in the foreseeable use environment Defendant created. Defendant's use of Zortress®, Afinitor®, and Certican® under the shared name "everolimus" compounded that danger by allowing Certican®'s non-U.S. heart-transplant approval narrative to circulate in the U.S. prescribing environment while Zortress®'s restrictive warning was de-emphasized.

68. The danger arose not from isolated physician misuse, but from the foreseeable use environment Defendant created or materially advanced: one in which heart-transplant conversion appeared normalized, clinically supported, and kidney-protective, while the complete risk profile for that population had never been assembled or disclosed. Even under Defendant's anticipated learned-intermediary argument, the warnings to prescribing physicians were inadequate. The *de novo* framing was read in practice as inapplicable to converted patients, and no supplemental

prescriber documentation, Dear Healthcare Provider letter, or clinical framework existed to close that gap. Adequate warnings would have prevented or materially changed Dov Fischman's exposure. This unreasonably dangerous conduct was a producing cause of his injuries and death.

69. To the extent Defendant invokes Tex. Civ. Prac. & Rem. Code § 82.007(a), Plaintiff invokes § 82.007(b)(3). Defendant materially advanced heart-transplant use of everolimus in a manner inconsistent with FDA's approved indication and warning framework, and did so using a commercial strategy that mirrored the off-label promotion conduct for which its pharmacologic predecessor had already been subject to a $490.9 million federal enforcement resolution. Dov Fischman's injuries and death were causally related to that off-label use.

### COUNT THREE: STRICT PRODUCTS LIABILITY — FAILURE TO WARN

70. Plaintiff incorporates all preceding paragraphs. Defendant had a duty to provide adequate warnings to prescribing physicians and other learned intermediaries concerning everolimus, including a duty to ensure that the heart-transplant warning retained practical force in the real-world prescribing environment and that physicians had the complete risk information needed to evaluate whether everolimus was appropriate for any particular heart-transplant patient. To the extent Defendant invokes the learned-intermediary doctrine, that doctrine does not protect a manufacturer that deliberately cultivated physician adoption through clinical trial activity, study registrations, and market-facing benefit narratives, and then relies on the judgment of the very physicians it shaped as a shield against liability.

71. Defendant's warnings were inadequate on multiple independent grounds. The Black Box Warning's *de novo* framing foreseeably caused prescribers to read the mortality signal as inapplicable to stable converted heart-transplant patients, and that reading occurred in practice. The remainder of the insert provided no heart-transplant-specific adverse-event profile, dosing

framework, patient-selection criteria, monitoring schedule, risk-recognition safeguards, or benefit-risk assessment, leaving prescribers and later treating physicians with a risk framework built for different patient populations. Defendant failed to update or strengthen the warning once heart-transplant conversion became a real-world prescribing pathway and once additional material risks were not captured by the existing Black Box Warning. The warning framework also failed to address antiviral management, the risk of removing Valcyte®/valganciclovir from a high-risk CMV patient at conversion, the long-term mTOR-related risks relevant to heart-transplant patients, or prior chemotherapy-related cardiac injury as a patient-selection factor requiring heightened caution. Defendant's benefit narratives and brand-conflation strategy further diluted the warning by making conversion appear protective and clinically supported while allowing non-U.S. heart-transplant approval information to obscure Zortress®'s restrictive U.S. warning and allowing everolimus's oncology identity to recede from the transplant framing.

72. This failure was a producing cause of Dov Fischman's exposure, injuries, and death. Had Defendant clearly communicated the complete heart-transplant risk profile, including the applicability of the warning to converted patients, the absence of an approved heart-transplant framework, the CMV and antiviral-protection risks, the systemic mTOR immune effects, the true source of any kidney benefit, and the heightened caution required for a patient whose original heart failure was caused by chemotherapy-related injury, the prescribing physician would not have treated the warning as inapplicable to Dov Fischman, and he would not have been exposed to everolimus under the same circumstances, if at all. At minimum, adequate warnings would have required a materially different risk-benefit analysis, monitoring plan, antiviral-management decision, patient-selection assessment, and informed prescribing pathway before conversion proceeded.

73. To the extent Defendant invokes Tex. Civ. Prac. & Rem. Code § 82.007(a), Plaintiff invokes § 82.007(b)(3), as alleged above.

## COUNT FOUR: NEGLIGENCE

74. Plaintiff incorporates all preceding paragraphs. Defendant owed reasonable-care duties arising from its control over the warning, labeling, risk-communication, and market-facing conduct through which everolimus reached prescribing physicians and foreseeable patients, including Dov Fischman. Plaintiff does not allege that Defendant owed a freestanding duty to treat Dov Fischman, override any physician, or manufacture the generic tablet dispensed to him. Defendant's duty arose from its own conduct: controlling the reference-labeling framework, advancing the transplant-conversion narrative, and shaping the information environment in which prescribing decisions were made.

75. Defendant breached those duties by maintaining a warning framework whose *de novo* framing foreseeably made the Black Box Warning appear inapplicable to stable converted patients, a reading that occurred in practice. Defendant failed to update or supplement the warning despite knowing, through post-approval use, study activity, and its own market conduct, that converted heart-transplant recipients were a real-world everolimus population requiring a complete risk disclosure. Defendant also advanced heart-transplant conversion as normalized and clinically supported while providing no dosing guide, transition protocol, monitoring schedule, contraindication framework, patient-selection criteria, or risk-recognition safeguards, leaving prescribers and later treating physicians without the clinical infrastructure Defendant had the ability and responsibility to provide. Defendant further disseminated misleading benefit narratives, including a kidney-sparing story that misattributed a cyclosporine-reduction benefit to everolimus and made conversion appear safer and more justified than the complete risk picture supported.

76. Adequate discharge of those duties would have prevented or materially changed Dov Fischman's exposure. A clarified warning for converted heart-transplant recipients would have prevented the Black Box Warning from being read as inapplicable. A complete heart-transplant risk profile or prescribing framework would have changed the information available before conversion. Accurate disclosure that the kidney benefit came from cyclosporine reduction, and could be achieved through approved alternatives, would have removed the principal market justification for everolimus. Disclosure of the antiviral-management risk would have identified a specific precaution applicable to Dov Fischman's CMV profile at the time of conversion. Disclosure that everolimus was an oncology-lineage mTOR inhibitor with chemotherapy-comparable systemic effects would have required heightened caution in a patient whose original heart failure was caused by chemotherapy-related injury.

77. Defendant's breaches were a cause-in-fact and proximate cause of Dov Fischman's injuries and death. The causal chain is direct and foreseeable: Defendant's inadequate warning allowed the heart-transplant prohibition to be read as inapplicable to a stable converted patient; that interpretation supported the May 2024 conversion; the conversion was followed by Dov Fischman's immune collapse, post-transplant lymphoproliferative disorder, severe infection, and sepsis; and sepsis caused his death on January 6, 2025. Each step in that chain was the foreseeable result of Defendant's specific breaches. Plaintiff is entitled to recover all wrongful-death damages permitted under Tex. Civ. Prac. & Rem. Code § 71.004 in her individual capacity as a statutory beneficiary.

**COUNT FIVE: GROSS NEGLIGENCE**

*Tex. Civ. Prac. & Rem. Code § 41.003*

78. Plaintiff incorporates all preceding paragraphs. Defendant's conduct constituted gross negligence under Tex. Civ. Prac. & Rem. Code § 41.001(11). From Defendant's standpoint, advancing everolimus for heart-transplant conversion use involved an extreme degree of risk. Defendant's own labeling identified increased mortality and serious infection concerns in the heart-transplant context. Everolimus was not ordinary transplant maintenance therapy, but an oncology-lineage mTOR inhibitor whose mechanism reaches beyond rejection control and impairs the cellular defenses needed to fight infection and suppress abnormal cell growth. That risk was especially acute where the patient's original heart failure was caused by chemotherapy-related injury. Defendant also knew, from the Rapamune enforcement history preceding everolimus's market entry, that mTOR transplant-conversion promotion carried serious legal and clinical risk. Defendant nevertheless advanced a use for which it provided no clinical prescribing framework, monitoring protocol, risk-recognition safeguards, or complete heart-transplant risk profile, making the known risk even more extreme.

79. Defendant had actual, subjective awareness of that risk from its own labeling, postmarketing adverse-event obligations, study activity, market-facing materials, patient-assistance decisions, and the Rapamune enforcement record. Defendant knew the kidney-sparing narrative misattributed a cyclosporine-reduction effect to everolimus, that the CAV and CMV benefit narratives did not answer the core safety question for stable converted patients, and that removing antiviral prophylaxis from a high-risk CMV patient at conversion created a serious risk not disclosed in its labeling or risk communications. Defendant also knew everolimus used a materially similar mTOR-inhibition mechanism to sirolimus, and that its everolimus strategy mirrored the transplant-conversion strategy already exposed through the Rapamune resolution.

80. Despite that actual awareness, Defendant proceeded with conscious indifference. Plaintiff alleges that Defendant brought everolimus into the same transplant-conversion market after the Rapamune resolution, using a materially similar mTOR compound, a new brand identity, and the same conversion strategy. Defendant continued to support benefit-focused transplant narratives, brand-blurring practices, off-label normalization, and access-channel conduct that weakened the practical force of the heart-transplant warning while knowing similar conduct had already been the subject of a major federal enforcement resolution. These were corporate-level decisions made or ratified by officers, directors, or personnel with authority to set corporate policy. Choosing to advance the same mTOR conversion strategy while providing no clinical infrastructure to make that use safe reflects conscious disregard of known danger to heart-transplant patients, including Dov Fischman, and warrants exemplary damages under Texas law.

## COUNT SIX: TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT

*Tex. Bus. & Com. Code §§ 17.41–63*

81. Plaintiff incorporates all preceding paragraphs. Dov Fischman was a consumer within the meaning of the DTPA: he sought and acquired pharmaceutical goods and related access services for his direct personal medical use, including Defendant's branded Neoral® over approximately nine years of transplant maintenance, and the everolimus and access pathway through which he received it. The DTPA does not require direct contractual privity where the consumer sought or acquired goods forming the basis of the complaint.

82. Defendant engaged in false, misleading, or deceptive acts or practices under Tex. Bus. & Com. Code § 17.46(b), including §§ 17.46(b)(5), (7), and (24). Defendant represented that everolimus had characteristics and approval significance it did not have, including kidney-sparing

properties and heart-transplant clinical support. The kidney-sparing representation was false: the claimed renal benefit came from reducing cyclosporine, not from anything everolimus itself does for kidney function. Defendant credited everolimus with a benefit produced by lowering another drug while failing to disclose that the same renal goal could have been achieved through approved alternatives without introducing an oncology-lineage mTOR inhibitor. Defendant also created a false impression of U.S. heart-transplant support by centering the transplant narrative on the shared generic name "everolimus" rather than Zortress®, allowing Certican®'s non-U.S. heart-transplant approval narrative to migrate into the U.S. prescribing environment while Zortress®'s warning was de-emphasized and everolimus's oncology identity was not clearly disclosed in the transplant framing.

83. Defendant also failed to disclose material information in violation of Tex. Bus. & Com. Code § 17.46(b)(24). The warning's *de novo* framing was deceptive by omission: it foreseeably caused physicians and patients to understand the mortality warning as inapplicable to stable converted heart-transplant patients, while Defendant failed to disclose the complete heart-transplant risk profile. Those omissions included the absence of an FDA-approved dosing, monitoring, patient-selection, risk-recognition, and benefit-risk framework for converted patients; the CMV and antiviral-management risks created by removing Valcyte®/valganciclovir at conversion; the long-term mTOR-related systemic risks; the true origin of the kidney benefit; the oncology identity and chemotherapy-comparable systemic effects of everolimus; and prior chemotherapy-related cardiac injury as a patient-selection factor requiring heightened caution. Each omission concerned information material to the goods and access transaction at issue.

84. Defendant's deceptive conduct was connected to the transaction through which Dov Fischman obtained everolimus for personal medical use in Dallas, Texas. That transaction

occurred within a broader Novartis transplant-drug relationship, including his long-term use of Defendant's branded Neoral® as a "Brand Medically Necessary" transplant medication, and depended on Defendant-controlled product information, labeling, risk disclosures, and transplant-market materials that shaped how everolimus was understood before he received it.

85.   Defendant also engaged in unconscionable conduct within the meaning of Tex. Bus. & Com. Code § 17.45(5) by taking advantage of Dov Fischman's lack of knowledge, ability, and experience to a grossly unfair degree. He had no meaningful ability to evaluate the *de novo* warning structure, the absence of an FDA-approved heart-transplant framework, the misleading benefit narratives, the consequences of removing antiviral protection at conversion, the oncology identity and chemotherapy-comparable systemic effects of everolimus, or the systemic risk created by replacing a decade-stable CNI-based regimen with an oncology-lineage mTOR inhibitor. He was wholly dependent on manufacturer-controlled risk information, and that information was structured to obscure the risks he needed to understand.

86.   Plaintiff alleges that Defendant acted knowingly and intentionally within the meaning of Tex. Bus. & Com. Code § 17.50(b)(1). Defendant had actual awareness of the heart-transplant warning, the lack of FDA approval for heart-transplant use, the Rapamune enforcement history, the misleading kidney-sparing narrative, the antiviral-management risks for high-risk CMV patients, and the 2024 patient-assistance removal decision. Defendant knew its everolimus strategy mirrored the strategy that had already generated a $490.9 million federal enforcement resolution involving its pharmacologic predecessor, yet continued to position everolimus in a manner that obscured the real-world significance of those risks. Plaintiff therefore seeks all additional damages authorized by the DTPA for knowing and intentional conduct.

## VIII.  DAMAGES

87. Plaintiff seeks all damages recoverable under applicable law in her individual capacity as a statutory wrongful death beneficiary, including wrongful-death damages under Tex. Civ. Prac. & Rem. Code § 71.004; actual damages under the DTPA; additional DTPA damages for Defendant's knowing and intentional conduct; exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003; pre- and post-judgment interest; and costs of court. Plaintiff does not seek survival damages or damages belonging to any estate. The amount in controversy substantially exceeds $5 million.

## IX. JURY DEMAND

88. Plaintiff demands a trial by jury on all issues so triable.

## X. PRAYER

89. WHEREFORE, Plaintiff Gallit Fischman respectfully requests that the Court enter judgment against Defendant Novartis Pharmaceuticals Corporation for all actual damages proven at trial; additional DTPA damages; exemplary damages; pre- and post-judgment interest; costs of court; and any additional relief to which Plaintiff is justly entitled.

Respectfully submitted,

Date: May 29, 2026

/s/ _Gallit Fischman_____

**GALLIT FISCHMAN, PRO SE**
10114 Deermont Trail
Dallas, TX 75243
(214) 893-6720
gallitfischman@yahoo.com

# EXHIBIT A

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use ZORTRESS safely and effectively. See full prescribing information for ZORTRESS.**

**ZORTRESS® (everolimus) tablets, for oral use**
**Initial U.S. Approval: 2010**

---

> **WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**
> *See full prescribing information for complete boxed warning.*
>
> - **Only physicians experienced in immunosuppressive therapy and management of transplant patients should use Zortress (5.1)**
> - **Increased susceptibility to infection and the possible development of malignancies may result from immunosuppression (5.2, 5.3)**
> - **Increased incidence of kidney graft thrombosis (5.4)**
> - **Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce nephrotoxicity (2.4, 2.5, 5.6, 12.7, 12.8)**
> - **Increased mortality in a heart transplant clinical trial. Use in heart transplantation is not recommended (5.7)**

-----------------------RECENT MAJOR CHANGES-----------------------
Warnings and Precautions, Cannabidiol Drug Interactions (5.22)      9/2023

-----------------------INDICATIONS AND USAGE-----------------------
Zortress is an mTOR inhibitor immunosuppressant indicated for the prophylaxis of organ rejection in adult patients:
- Kidney Transplant: at low-moderate immunologic risk. Use in combination with basiliximab, cyclosporine (reduced doses) and corticosteroids (1.1)
- Liver Transplant: Administer no earlier than 30 days posttransplant. Use in combination with tacrolimus (reduced doses) and corticosteroids (1.2, 5.5)

Limitations of Use: Safety and efficacy have not been established in the following:
- Kidney transplant patients at high immunologic risk (1.3)
- Recipients of transplanted organs other than kidney or liver (1.3, 5.7)
- Pediatric patients (less than 18 years) (1.3)

-----------------------DOSAGE AND ADMINISTRATION-----------------------
- Kidney Transplantation: starting oral dose of 0.75 mg twice daily as soon as possible after transplantation (2.1)
- Liver Transplantation: starting oral dose of 1 mg twice daily starting 30 days after transplantation (2.2)
- Monitor Everolimus Concentrations: Adjust maintenance dose to achieve trough concentrations within the 3 to 8 ng/mL target range using LC/MS/MS assay method (2.1, 2.2, 2.3)
- Administer consistently with or without food at the same time as cyclosporine or tacrolimus (2.6, 12.3)
- Mild Hepatic Impairment: Reduce initial daily dose by one-third (2.7)
- Moderate or Severe Hepatic Impairment: Reduce initial daily dose by one-half (2.7, 12.6)

-----------------------DOSAGE FORMS AND STRENGTHS-----------------------
Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets (3)

-----------------------CONTRAINDICATIONS-----------------------
- Hypersensitivity to everolimus, sirolimus, or to components of the drug product (4)

-----------------------WARNINGS AND PRECAUTIONS-----------------------
- Angioedema [increased risk with concomitant angiotensin converting enzyme (ACE inhibitors)]: Monitor for symptoms and treat promptly (5.8)
- Delayed Wound Healing/Fluid Accumulation: Monitor symptoms; treat promptly to minimize complications (5.9)
- Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis: Monitor for symptoms or radiologic changes; manage by dose reduction or discontinuation until symptoms resolve; consider use of corticosteroids (5.10)
- Hyperlipidemia (elevations of serum cholesterol and triglycerides): Monitor and consider anti-lipid therapy (5.11)
- Proteinuria (increased risk with higher trough concentrations): Monitor urine protein (5.12)
- Polyoma Virus Infections (activation of latent viral infections; BK virus associated nephropathy): Consider reducing immunosuppression (5.13)
- TMA/TTP/HUS (concomitant use with cyclosporine may increase risk): Monitor for hematologic changes or symptoms (5.15)
- New Onset Diabetes After Transplantation: Monitor serum glucose (5.16)
- Male Infertility: Azoospermia or oligospermia may occur (5.18, 13.1)
- Immunizations: Avoid live vaccines (5.19)
- Embryo-Fetal Toxicity: Advise females of reproductive potential of the potential risk to a fetus and to use effective contraception during treatment with Zortress and for 8 weeks after final dose (5.17, 8.1, 8.3)

-----------------------ADVERSE REACTIONS-----------------------
Most common adverse reactions were as follows:
- Kidney Transplantation (incidence greater than or equal to 20%): peripheral edema, constipation, hypertension, nausea, anemia, urinary tract infection (UTI), and hyperlipidemia (6.1)
- Liver Transplantation (incidence greater than 10%): diarrhea, headache, peripheral edema, hypertension, nausea, pyrexia, abdominal pain, leukopenia, and hypercholesterolemia (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Novartis Pharmaceuticals Corporation at 1-888-669-6682 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

-----------------------DRUG INTERACTIONS-----------------------
Strong-moderate CYP3A4 inhibitors (e.g., cyclosporine, ketoconazole, erythromycin, verapamil) and CYP3A4 inducers (e.g., rifampin) may affect everolimus concentrations (7.1). Consider Zortress dose adjustment (5.14)

Therapeutic drug monitoring and dose reduction for Zortress should be considered when Zortress is coadministered with cannabidiol (5.22, 7.13)

-----------------------USE IN SPECIFIC POPULATIONS-----------------------
- Pregnancy: Based on animal data, may cause maternal and fetal harm (8.1)
- Lactation: Breastfeeding not recommended (8.2)
- Females and Males of Reproductive Potential: May impair fertility (8.1, 8.3, 13.1)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 2/2024**

**FULL PRESCRIBING INFORMATION: CONTENTS***
**WARNING: MALIGNANCIES and SERIOUS INFECTIONS;**
**KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and**
**MORTALITY IN HEART TRANSPLANTATION**

**1    INDICATIONS AND USAGE**
   1.1    Prophylaxis of Organ Rejection in Kidney Transplantation
   1.2    Prophylaxis of Organ Rejection in Liver Transplantation
   1.3    Limitations of Use
**2    DOSAGE AND ADMINISTRATION**
   2.1    Dosage in Adult Kidney Transplant Patients
   2.2    Dosage in Adult Liver Transplant Patients
   2.3    Therapeutic Drug Monitoring (TDM) - Everolimus
   2.4    Therapeutic Drug Monitoring (TDM) - Cyclosporine in Kidney Transplant Patients
   2.5    Therapeutic Drug Monitoring (TDM) – Tacrolimus in Liver Transplant Patients
   2.6    Administration
   2.7    Hepatic Impairment
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
   4.1    Hypersensitivity Reactions
**5    WARNINGS AND PRECAUTIONS**
   5.1    Management of Immunosuppression
   5.2    Lymphomas and Other Malignancies
   5.3    Serious Infections
   5.4    Kidney Graft Thrombosis
   5.5    Hepatic Artery Thrombosis
   5.6    Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity
   5.7    Heart Transplantation
   5.8    Angioedema
   5.9    Wound Healing and Fluid Accumulation
   5.10   Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis
   5.11   Hyperlipidemia
   5.12   Proteinuria
   5.13   Polyoma Virus Infections
   5.14   Interaction With Strong Inhibitors and Inducers of CYP3A4
   5.15   Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome
   5.16   New Onset Diabetes After Transplant
   5.17   Embryo-Fetal Toxicity
   5.18   Male Infertility
   5.19   Immunizations
   5.20   Interaction With Grapefruit Juice
   5.21   Patients With Hereditary Disorders/Other
   5.22   Cannabidiol Drug Interactions
**6    ADVERSE REACTIONS**
   6.1    Serious and Otherwise Important Adverse Reactions
   6.2    Clinical Trials Experience
   6.3    Postmarketing Experience
**7    DRUG INTERACTIONS**

   7.1    Interactions With Strong Inhibitors or Inducers of CYP3A4 and P-glycoprotein
   7.2    Cyclosporine (CYP3A4/P-gp Inhibitor and CYP3A4 Substrate)
   7.3    Ketoconazole and Other Strong CYP3A4 Inhibitors
   7.4    Erythromycin (Moderate CYP3A4 Inhibitor)
   7.5    Verapamil (CYP3A4 and P-gp Substrate)
   7.6    Atorvastatin (CYP3A4 Substrate) and Pravastatin (P-gp Substrate)
   7.7    Simvastatin and Lovastatin
   7.8    Rifampin (Strong CYP3A4/P-gp Inducers)
   7.9    Midazolam (CYP3A4/5 Substrate)
   7.10   Other Possible Interactions
   7.11   Octreotide
   7.12   Tacrolimus
   7.13   Cannabidiol
**8    USE IN SPECIFIC POPULATIONS**
   8.1    Pregnancy
   8.2    Lactation
   8.3    Females and Males of Reproductive Potential
   8.4    Pediatric Use
   8.5    Geriatric Use
   8.6    Hepatic Impairment
   8.7    Renal Impairment
**10   OVERDOSAGE**
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
   12.1   Mechanism of Action
   12.3   Pharmacokinetics
   12.5   Drug-Drug Interactions
   12.6   Specific Populations
   12.7   Everolimus Whole Blood Concentrations Observed in Kidney and in Liver Transplant Patients
   12.8   Cyclosporine Concentrations Observed in Kidney Transplant Patients
   12.9   Tacrolimus Concentrations in Liver Transplant
**13   NONCLINICAL TOXICOLOGY**
   13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
   13.2   Animal Toxicology and/or Pharmacology
**14   CLINICAL STUDIES**
   14.1   Prevention of Organ Rejection After Kidney Transplantation
   14.2   Prevention of Organ Rejection After Liver Transplantation
**16   HOW SUPPLIED/STORAGE AND HANDLING**
**17   PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

---

**WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**

**Malignancies and Serious Infections**
- **Only physicians experienced in immunosuppressive therapy and management of transplant patients should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for maintenance therapy should have complete information requisite for the follow-up of the patient _[see Warnings and Precautions (5.1)]_.**
- **Increased susceptibility to infection and the possible development of malignancies, such as lymphoma and skin cancer, may result from immunosuppression _[see Warnings and Precautions (5.2, 5.3)]_.**

**Kidney Graft Thrombosis**
- **An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, was reported, mostly within the first 30 days posttransplantation _[see Warnings and Precautions (5.4)]_.**

**Nephrotoxicity**
- **Increased nephrotoxicity can occur with use of standard doses of cyclosporine in combination with Zortress. Therefore, reduced doses of cyclosporine should be used in combination with Zortress in order to reduce renal dysfunction. It is important to monitor the cyclosporine and everolimus whole blood trough concentrations _[see Dosage and Administration (2.4, 2.5), Warnings and Precautions (5.6), Clinical Pharmacology (12.7, 12.8)]_.**

**Mortality in Heart Transplantation**
- **Increased mortality, often associated with serious infections, within the first three months posttransplantation was observed in a clinical trial of _de novo_ heart transplant patients receiving immunosuppressive regimens with or without induction therapy. Use in heart transplantation is not recommended _[see Warnings and Precautions (5.7)]_.**

---

## 1    INDICATIONS AND USAGE

### 1.1    Prophylaxis of Organ Rejection in Kidney Transplantation

Zortress is indicated for the prophylaxis of organ rejection in adult patients at low to moderate immunologic risk receiving a kidney transplant _[see Clinical Studies (14.1)]_. Zortress is to be administered in combination with basiliximab induction and concurrently with reduced doses of cyclosporine and with corticosteroids. Therapeutic drug monitoring (TDM) of everolimus and cyclosporine is recommended for all patients receiving these products _[see Dosage and Administration (2.2, 2.3)]_.

### 1.2    Prophylaxis of Organ Rejection in Liver Transplantation

Zortress is indicated for the prophylaxis of allograft rejection in adult patients receiving a liver transplant. Zortress is to be administered no earlier than 30 days posttransplant concurrently in combination with reduced doses of tacrolimus and with corticosteroids _[see Warnings and Precautions (5.5), Clinical Studies (14.2)]_. TDM of everolimus and tacrolimus is recommended for all patients receiving these products _[see Dosage and Administration (2.3, 2.5)]_.

### 1.3    Limitations of Use

The safety and efficacy of Zortress has not been established in the following populations:

- Kidney transplant patients at high immunologic risk.
- Recipients of transplanted organs other than kidney and liver _[see Warnings and Precautions (5.7)]_.
- Pediatric patients (less than 18 years).

## 2    DOSAGE AND ADMINISTRATION

Patients receiving Zortress may require dose adjustments based on everolimus blood concentrations achieved, tolerability, individual response, change in concomitant medications and the clinical situation. Optimally, dose adjustments of Zortress should be based on trough concentrations obtained 4 or 5 days after a previous dosing change. Dose adjustment is required if the trough concentration is below 3 ng/mL. The total daily dose of Zortress should be doubled using the available tablet strengths (0.25 mg, 0.5 mg, 0.75 mg, or 1 mg). Dose adjustment is also required if the trough

concentration is greater than 8 ng/mL on 2 consecutive measures; the dose of Zortress should be decreased by 0.25 mg twice daily *[see Dosage and Administration (2.3), Clinical Pharmacology (12.3)]*.

### 2.1     Dosage in Adult Kidney Transplant Patients

An initial Zortress dose of 0.75 mg orally twice daily (1.5 mg per day) is recommended for adult kidney transplant patients in combination with reduced-dose cyclosporine, administered as soon as possible after transplantation *[see Dosage and Administration (2.3, 2.4), Clinical Studies (14.1)]*.

Oral prednisone should be initiated once oral medication is tolerated. Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

### 2.2     Dosage in Adult Liver Transplant Patients

Start Zortress at least 30 days posttransplant. An initial dose of 1 mg orally twice daily (2 mg per day) is recommended for adult liver transplant patients in combination with reduced-dose tacrolimus *[see Dosage and Administration (2.3, 2.5), Clinical Studies (14.2)]*.

Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

### 2.3     Therapeutic Drug Monitoring (TDM) - Everolimus

Routine everolimus whole blood therapeutic drug concentration monitoring is recommended for all patients. The recommended everolimus therapeutic range is 3 to 8 ng/mL *[see Clinical Pharmacology (12.7)]*. Careful attention should be made to clinical signs and symptoms, tissue biopsies, and laboratory parameters. It is important to monitor everolimus blood concentrations, in patients with hepatic impairment, during concomitant administration of CYP3A4 inducers or inhibitors or cannabidiol, when switching cyclosporine formulations and/or when cyclosporine dosing is reduced according to recommended target concentrations *[see Drug Interactions (7), Clinical Pharmacology (12.7, 12.8)]*.

There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced. There is little to no pharmacokinetic interaction of tacrolimus on everolimus, and thus, everolimus concentrations do not decrease if the tacrolimus exposure is reduced *[see Drug Interactions (7.2)]*.

The everolimus recommended therapeutic range of 3 to 8 ng/mL is based on an LC/MS/MS assay method. Currently in clinical practice, everolimus whole blood trough concentrations may be measured by chromatographic or immunoassay methodologies. Because the measured everolimus whole blood trough concentrations depend on the assay used, individual patient sample concentration values from different assays may not be interchangeable. Consideration of assay results must be made with knowledge of the specific assay used. Therefore, communication should be maintained with the laboratory performing the assay.

### 2.4     Therapeutic Drug Monitoring (TDM) - Cyclosporine in Kidney Transplant Patients

Both cyclosporine doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the risk of nephrotoxicity *[see Warnings and Precautions (5.6), Drug Interactions (7.2), Clinical Pharmacology (12.8)]*.

The recommended cyclosporine therapeutic ranges when administered with Zortress are 100 to 200 ng/mL through Month 1 posttransplant, 75 to 150 ng/mL at Months 2 and 3 posttransplant, 50 to 100 ng/mL at Month 4 posttransplant, and 25 to 50 ng/mL from Month 6 through Month 12 posttransplant. The median trough concentrations observed in the clinical trial ranged between 161 to 185 ng/mL through Month 1 posttransplant and between 111 to 140 ng/mL at Months 2 and 3 posttransplant. The median trough concentration was 99 ng/mL at Month 4 posttransplant and ranged between 46 to 75 ng/mL from Months 6 through Month 12 posttransplant *[see Clinical Pharmacology (12.8), Clinical Studies (14.1)]*.

Cyclosporine, USP Modified is to be administered as oral capsules twice daily unless cyclosporine oral solution or intravenous administration of cyclosporine cannot be avoided. Cyclosporine, USP Modified should be initiated as soon as possible, and no later than 48 hours after reperfusion of the graft and dose adjusted to target concentrations from Day 5 onwards.

If impairment of renal function is progressive, the treatment regimen should be adjusted. In renal transplant patients, the cyclosporine dose should be based on cyclosporine whole blood trough concentrations *[see Clinical Pharmacology (12.8)]*.

In renal transplantation, there are limited data regarding dosing Zortress with reduced cyclosporine trough concentrations of 25 to 50 ng/mL after 12 months. Zortress has not been evaluated in clinical trials with other formulations of cyclosporine. Prior to dose reduction of cyclosporine, it should be ascertained that steady-state everolimus whole blood trough concentration is at least 3 ng/mL. There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced *[see Drug Interactions (7.2)]*.

**2.5    Therapeutic Drug Monitoring (TDM) – Tacrolimus in Liver Transplant Patients**

Both tacrolimus doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the potential risk of nephrotoxicity *[see Warnings and Precautions (5.6), Clinical Pharmacology (12.9)]*.

The recommended tacrolimus therapeutic range when administered with Zortress are whole blood trough ($C_{-0h}$) concentrations of 3 to 5 ng/mL by three weeks after the first dose of Zortress (approximately Month 2) and through Month 12 posttransplant.

The median tacrolimus trough concentrations observed in the clinical trial ranged between 8.6 to 9.5 ng/mL at Weeks 2 and 4 posttransplant (prior to initiation of everolimus). The median tacrolimus trough concentrations ranged between 7 to 8.1 ng/mL at Weeks 5 and 6 posttransplant, between 5.2 to 5.6 ng/mL at Months 2 and 3 posttransplant, and between 4.3 to 4.9 ng/mL between Months 4 and 12 posttransplant *[see Clinical Pharmacology (12.9), Clinical Studies (14.2)]*.

Tacrolimus is to be administered as oral capsules twice daily unless intravenous administration of tacrolimus cannot be avoided.

In liver transplant patients, the tacrolimus dose should be based on tacrolimus whole blood trough concentrations *[see Clinical Pharmacology (12.9)]*.

In liver transplantation, there are limited data regarding dosing Zortress with reduced tacrolimus trough concentrations of 3 to 5 ng/mL after 12 months. Prior to dose reduction of tacrolimus, it should be ascertained that the steady-state everolimus whole blood trough concentration is at least 3 ng/mL. Unlike the interaction between cyclosporine and everolimus, tacrolimus does not affect everolimus trough concentrations, and consequently, everolimus concentrations do not decrease if the tacrolimus exposure is reduced.

**2.6    Administration**

Zortress tablets should be swallowed whole with a glass of water and not crushed before use.

Administer Zortress consistently approximately 12 hours apart with or without food to minimize variability in absorption and at the same time as cyclosporine or tacrolimus *[see Clinical Pharmacology (12.3)]*.

**2.7    Hepatic Impairment**

Whole blood trough concentrations of everolimus should be closely monitored in patients with impaired hepatic function. For patients with mild hepatic impairment (Child-Pugh Class A), the initial daily dose should be reduced by approximately one-third of the normally recommended daily dose. For patients with moderate or severe hepatic impairment (Child-Pugh Class B or C), the initial daily dose should be reduced to approximately one-half of the normally recommended daily dose. Further dose adjustment and/or dose titration should be made if a patient's whole blood trough concentration of everolimus, as measured by an LC/MS/MS assay, is not within the target trough concentration range of 3 to 8 ng/mL *[see Clinical Pharmacology (12.6)]*.

**3       DOSAGE FORMS AND STRENGTHS**

Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets.

**Table 1. Description of Zortress (everolimus) Tablets**

| Dosage strength | 0.25 mg | 0.5 mg | 0.75 mg | 1 mg |
|---|---|---|---|---|
| Appearance | White to yellowish, marbled, round, flat tablets with beveled edge | | | |
| Imprint | "C" on one side and "NVR" on the other | "CH" on one side and "NVR" on the other | "CL" on one side and "NVR" on the other | "CU" on one side and "NVR" on the other |

## 4    CONTRAINDICATIONS

### 4.1    Hypersensitivity Reactions

Zortress is contraindicated in patients with known hypersensitivity to everolimus, sirolimus, or to components of the drug product.

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Management of Immunosuppression

Only physicians experienced in management of systemic immunosuppressant therapy in transplantation should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for the maintenance therapy should have complete information requisite for the follow-up of the patient. In limited data with the complete elimination of calcineurin inhibition (CNI), there was an increased risk of acute rejection.

### 5.2    Lymphomas and Other Malignancies

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing lymphomas and other malignancies, particularly of the skin. The risk appears to be related to the intensity and duration of immunosuppression rather than to the use of any specific agent.

As usual for patients with increased risk for skin cancer, exposure to sunlight and ultraviolet light should be limited by wearing protective clothing and using a sunscreen with a high protection factor.

### 5.3    Serious Infections

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing bacterial, viral, fungal, and protozoal infections, including opportunistic infections *[see Warnings and Precautions (5.13), Adverse Reactions (6.1, 6.2)]*. These infections may lead to serious, including fatal, outcomes. Because of the danger of over-immunosuppression, which can cause increased susceptibility to infection, combination immunosuppressant therapy should be used with caution.

Antimicrobial prophylaxis for *Pneumocystis jiroveci* (*carinii*) pneumonia and prophylaxis for cytomegalovirus (CMV) is recommended in transplant recipients.

### 5.4    Kidney Graft Thrombosis

An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, has been reported, usually within the first 30 days posttransplantation *[see Boxed Warning]*.

### 5.5    Hepatic Artery Thrombosis

Mammalian target of rapamycin (mTOR) inhibitors are associated with an increase in hepatic artery thrombosis (HAT). Reported cases mostly have occurred within the first 30 days posttransplant and most also lead to graft loss or death. Therefore, Zortress should not be administered earlier than 30 days after liver transplant.

### 5.6    Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity

In kidney transplant recipients, Zortress with standard dose cyclosporine increases the risk of nephrotoxicity resulting in a lower glomerular filtration rate. Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce renal dysfunction *[see Boxed Warning, Indications and Usage (1.1), Clinical Pharmacology (12.8)]*.

In liver transplant recipients, Zortress has not been studied with standard dose tacrolimus. Reduced doses of tacrolimus should be used in combination with Zortress in order to minimize the potential risk of nephrotoxicity *[see Indications and Usage (1.2), Clinical Pharmacology (12.9)]*.

Renal function should be monitored during the administration of Zortress. Consider switching to other immunosuppressive therapies if renal function does not improve after dose adjustments or if the dysfunction is thought to be drug related. Caution should be exercised when using other drugs which are known to impair renal function.

### 5.7    Heart Transplantation

In a clinical trial of *de novo* heart transplant patients, Zortress in an immunosuppressive regimen, with or without induction therapy, resulted in an increased mortality often associated with serious infections within the first three months posttransplantation compared to the control regimen. Use of Zortress in heart transplantation is not recommended.

### 5.8    Angioedema

Zortress has been associated with the development of angioedema. The concomitant use of Zortress with other drugs known to cause angioedema, such as angiotensin converting enzyme (ACE) inhibitors may increase the risk of developing angioedema.

### 5.9    Wound Healing and Fluid Accumulation

Zortress increases the risk of delayed wound healing and increases the occurrence of wound-related complications like wound dehiscence, wound infection, incisional hernia, lymphocele and seroma. These wound-related complications may require more surgical intervention. Generalized fluid accumulation, including peripheral edema (e.g., lymphoedema) and other types of localized fluid collection, such as pericardial and pleural effusions and ascites have also been reported.

### 5.10    Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis

A diagnosis of interstitial lung disease (ILD) should be considered in patients presenting with symptoms consistent with infectious pneumonia but not responding to antibiotic therapy and in whom infectious, neoplastic and other non-drug causes have been ruled out through appropriate investigations. Cases of ILD, implying lung intraparenchymal inflammation (pneumonitis) and/or fibrosis of non-infectious etiology, some reported with pulmonary hypertension [including pulmonary arterial hypertension (PAH)] as a secondary event, have occurred in patients receiving rapamycins and their derivatives, including Zortress. Most cases generally resolve on drug interruption with or without glucocorticoid therapy. However, fatal cases have also occurred.

### 5.11    Hyperlipidemia

Increased serum cholesterol and triglycerides, requiring the need for anti-lipid therapy, have been reported to occur following initiation of Zortress and the risk of hyperlipidemia is increased with higher everolimus whole blood trough concentrations *[see Adverse Reactions (6.2)]*. Use of anti-lipid therapy may not normalize lipid levels in patients receiving Zortress.

Any patient who is administered Zortress should be monitored for hyperlipidemia. If detected, interventions, such as diet, exercise, and lipid-lowering agents should be initiated as outlined by the National Cholesterol Education Program guidelines. The risk/benefit should be considered in patients with established hyperlipidemia before initiating an immunosuppressive regimen containing Zortress. Similarly, the risk/benefit of continued Zortress therapy should be reevaluated in patients with severe refractory hyperlipidemia. Zortress has not been studied in patients with baseline cholesterol levels greater than 350 mg/dL.

Due to an interaction with cyclosporine, clinical trials of Zortress and cyclosporine in kidney transplant patients strongly discouraged patients from receiving the HMG-CoA reductase inhibitors simvastatin and lovastatin. During Zortress therapy with cyclosporine, patients administered an HMG-CoA reductase inhibitor and/or fibrate should be monitored for the possible development of rhabdomyolysis and other adverse effects, as described in the respective labeling for these agents *[see Drug Interactions (7.7)]*.

### 5.12    Proteinuria

The use of Zortress in transplant patients has been associated with increased proteinuria. The risk of proteinuria increased with higher everolimus whole blood trough concentrations. Patients receiving Zortress should be monitored for proteinuria *[see Adverse Reactions (6.2)]*.

**5.13    Polyoma Virus Infections**

Patients receiving immunosuppressants, including Zortress, are at increased risk for opportunistic infections, including polyoma virus infections. Polyoma virus infections in transplant patients may have serious, and sometimes fatal, outcomes. These include polyoma virus-associated nephropathy (PVAN), mostly due to BK virus infection, and JC virus associated progressive multiple leukoencephalopathy (PML). PVAN has been observed in patients receiving immunosuppressants, including Zortress. PVAN is associated with serious outcomes; including deteriorating renal function and kidney graft loss *[see Adverse Reactions (6.2)]*. Patient monitoring may help detect patients at risk for PVAN. Reductions in immunosuppression should be considered for patients who develop evidence of PVAN or PML. Physicians should also consider the risk that reduced immunosuppression represents to the functioning allograft.

**5.14    Interaction With Strong Inhibitors and Inducers of CYP3A4**

Coadministration of Zortress with strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, voriconazole, clarithromycin, telithromycin, ritonavir, boceprevir, telaprevir) or strong CYP3A4 inducers (e.g., rifampin, rifabutin) is not recommended without close monitoring of everolimus whole blood trough concentrations *[see Drug Interactions (7)]*.

**5.15    Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome**

The concomitant use of Zortress with cyclosporine may increase the risk of thrombotic microangiopathy (TMA)/thrombotic thrombocytopenic purpura (TTP)/hemolytic uremic syndrome (HUS). Monitor hematologic parameters *[see Adverse Reactions (6.2)]*.

**5.16    New Onset Diabetes After Transplant**

Zortress has been shown to increase the risk of new onset diabetes mellitus after transplant. Blood glucose concentrations should be monitored closely in patients using Zortress.

**5.17    Embryo-Fetal Toxicity**

Based on animal studies and the mechanism of action *[see Clinical Pharmacology (12.1)]*, Zortress may cause fetal harm when administered to a pregnant woman. In animal studies, everolimus caused embryo-fetal toxicity when administered during the period of organogenesis at maternal exposures that were equal to or less than human exposures at the recommended lowest starting dose. Advise pregnant women of the potential risk to a fetus. Advise female patients of reproductive potential to avoid becoming pregnant and to use effective contraception while using Zortress and for 8 weeks after ending treatment *[see Use in Specific Populations (8.1, 8.3)]*.

**5.18    Male Infertility**

Azoospermia or oligospermia may be observed *[see Adverse Reactions (6.2), Nonclinical Toxicology (13.1)]*. Zortress is an anti-proliferative drug and affects rapidly dividing cells like the germ cells.

**5.19    Immunizations**

The use of live vaccines should be avoided during treatment with Zortress; examples include (not limited to) the following: intranasal influenza, measles, mumps, rubella, oral polio, BCG, yellow fever, varicella, and TY21a typhoid vaccines.

**5.20    Interaction With Grapefruit Juice**

Grapefruit and grapefruit juice inhibit cytochrome P450 3A4 and P-gp activity and should therefore be avoided with concomitant use of Zortress and cyclosporine or tacrolimus.

**5.21    Patients With Hereditary Disorders/Other**

Patients with rare hereditary problems of galactose intolerance, the Lapp lactase deficiency or glucose-galactose malabsorption should not take Zortress as this may result in diarrhea and malabsorption.

**5.22    Cannabidiol Drug Interactions**

When cannabidiol and Zortress are coadministered, closely monitor for an increase in everolimus blood levels and for adverse reactions suggestive of everolimus toxicity. A dose reduction of Zortress should be considered as needed when Zortress is coadministered with cannabidiol *[see Dosage and Administration (2.3), Drug Interactions (7.13)]*.

# EXHIBIT B

## 2024 – 2025 NPAF Policy Change

These policy changes are applicable for <u>all</u> patients as of October 1, 2024

### <u>Continuation of NPAF Support for Currently Enrolled Patients</u>

- **Patients with Private Insurance** will continue to receive their Novartis medication through the end of their current enrollment period, up to the end of the calendar year.

- **Patients with Government Insurance** will continue to receive their Novartis medication through the end of the calendar year.

- **Uninsured Patients** will continue to receive their Novartis medication through the end of their current enrollment period (except for the discontinued products identified below).

### <u>Insurance and Income Criteria</u>

- **Private Insurance** (otherwise known as "Commercial Insurance" which is either provided by an employer or self-pay): Patients who have commercial insurance are **<u>not</u>** eligible for NPAF support
    - These changes apply to all patients with Private Insurance, even if their insurance does not cover the medication

- **Medicare:** Patients must have a household income of less than or equal to $81,760 (for a household size of two) to be considered for NPAF. See the NPAF Eligibility Income Limit Chart below if a patient's household size is greater or less than two

    **For Part D, the following is also applicable:**

    - If a patient's income is less than or equal to $30,660 for a married couple (or less than or equal to $22,590 for a single person) they may be eligible for Extra Help and must apply prior to applying for NPAF assistance

    - If they qualify for Extra Help they will not be eligible for NPAF support

    - If they are denied for Extra Help, they need to provide the Extra Help denial letter as part of their NPAF application

- **Medicaid, Government (Tricare, DoD, VA) and/or Uninsured:** Patients must have a household income of less than or equal to $81,760 (for a household size of two) to be considered for NPAF. See the NPAF Eligibility Income Limit Chart below if a patient's household size is greater or less than two

- **All Patients:** These changes are applicable to all on-label and off-label prescriptions



## 2024 – 2025 NPAF Policy Change

### *NPAF Eligibility Income Limit Chart (for different household sizes)*

| Household Size (as reported in your Tax Return) | 48 Contiguous States & U.S. Territories | Alaska | Hawaii |
|---|---|---|---|
| 1 | $60,240 | $75, 240 | $69,240 |
| 2 | $81,760 | $102,160 | $94,000 |
| 3 | $103,280 | $129,080 | $118,760 |
| 4 | $124,800 | $156,000 | $143,520 |
| Each Addt'l. Person | +$21,520 | + $26,920 | + $24,760 |

### *NPAF Product Discontinuation List*

As of January 1, 2025, the following products will **no longer be available** through NPAF:
- o  Afinitor*(everolimus)
- o  Exjade (deferasirox)
- o  Gilenya*(fingolimod)
- o  Gleevec (imatinib mesylate)
- o  Jadenu*(deferasirox)
- o  Myfortic (mycophenolic acid)
- o  Neoral (cyclosporine, USP)
- o  Sandimmune (cyclosporine)
- o  Tegretol (carbamazepine, USP)
- o  Tegretol XR (carbamazepine)
- o  Trileptal (oxcarbazepine)
- o  Zortress (everolimus)

*Note: Afinitor Disperz (everolimus), Gilenya (pediatric) (fingolimod), and Jadenu Sprinkles (deferasirox) will continue to be supported in NPAF.*



**NOVARTIS**

**Novartis Pharmaceuticals Corporation**
East Hanover, New Jersey 07936-1080                    © 2024                    8/24                    FA-11258316

# EXHIBIT C

Case 3:26-cv-01882-K-BT      Document 3     Filed 06/05/26      Page 48 of 54      PageID 52

 everolimus and heart transplant      ✕   🎤   📷   🔍

AI Mode    **All**    Images    Videos    Shopping    Forums    Short videos    More ▾    Tools ▾

---

✦ AI Overview                                                                          ⋮

Everolimus (Certican, Zortress) is **an mTOR inhibitor immunosuppressant used to prevent organ rejection in heart transplant recipients**. By reducing the body's immune response, it helps prevent white blood cells from attacking the new heart. It is uniquely valuable for preventing cardiac allograft vasculopathy (CAV) and protecting kidney function when combined with low-dose calcineurin inhibitors (CNIs). ❯ National Institutes of Health (.gov) +3

## Primary Uses & Benefits

Show more ⌄

 **National Institutes of Health (.gov)**
https://pmc.ncbi.nlm.nih.gov › articles › PMC3870122

## Everolimus in Heart Transplantation: An Update - PMC - NIH

by SW Hirt · 2013 · Cited by 49 — **Everolimus is currently the only mTOR inhibitor approved for use in heart transplantation**. It was developed to improve the pharmacokinetics of the mTOR ... Read more

 **JAMA**
https://jamanetwork.com › JAMA

## Everolimus and Low-Dose Tacrolimus After Heart ...

by CS Almond · 2025 · Cited by 1 — **Everolimus, a mammalian target of rapamycin (mTOR) inhibitor**, and low-dose tacrolimus have been shown to reduce the risk of several transplant ... Read more

 **The New England Journal of Medicine**
https://www.nejm.org › doi › full › NEJMoa022171

## Everolimus for the Prevention of Allograft Rejection and ...

by HJ Eisen · 2003 · Cited by 1428 — Sirolimus has been shown **to reduce the incidence of acute rejection** among renal-transplant recipients and to prevent cardiac-allograft vasculopathy in...



The Journal of Heart and Lung Transplantation
https://www.jhltonline.org › article › fulltext

## Long-term follow-up of the randomized, prospective ...

by E Bollano · 2024 · Cited by 6 — **Everolimus immunosuppression in de novo heart transplant recipients**: what does the evidence tell us now? Transpl Rev (Orlando). 2013; 27:76-84.  Read more



American College of Cardiology
https://www.acc.org › 2023/11/10 › teammate

## Tacrolimus and Everolimus Against Mycophenolate Mofetil ...

Nov 12, 2023 — The TEAMMATE trial showed that **everolimus with low-dose tacrolimus is safe in children and young adults** when given ≥6 months after cardiac ...  Read more



ScienceDirect.com
https://www.sciencedirect.com › article › abs › pii

## Maintenance Immunosuppression With Tacrolimus and ...

by M Vigil-Escalera · 2025 — Maintenance immunosuppression with delayed initiation of Everolimus in combination with Tacrolimus **is considered a valid strategy in heart transplant patients**.  Read more



American Journal of Transplantation
https://www.amjtransplant.org › article › fulltext

## Everolimus in Heart Transplantation: Does It Finally Have a ...

by JA Kobashigawa · 2014 · Cited by 8 — This editorial **approves the use of everolimus to wean calcineurin inhibitors** (by 7–11 weeks postoperative) as safe and effective with improved first-...



JACC Journals
https://www.jacc.org › doi › j.jchf.2021.01.007

## Everolimus for the Prevention of Calcineurin-Inhibitor ...

by C Anthony · 2021 · Cited by 30 — In **cardiac transplant** recipients, immunosuppressive therapy using combined low-dose **everolimus** and low-dose tacrolimus is safe and more effective in the ...  Read more

National Institutes of Health (.gov)
https://pmc.ncbi.nlm.nih.gov › articles › PMC6275357

## The role of everolimus in treatment of cardiac allograft ... - PMC

by T Watanabe · 2013 — **Everolimus has not yet been approved by the US Food and Drug Administration** to prevent organ rejection in heart transplantation recipients. Everolimus may be...

## People also ask

Is everolimus used in heart transplant patients?                                    ⌄

What medications should you avoid after a heart transplant?                          ⌄

Is everolimus better than tacrolimus?                                               ⌄

Can everolimus cause heart problems?                                                ⌄

▶ YouTube · American Society of Transplantation
240+ views · 5 months ago

## Everolimus and Low-Dose Tacrolimus After Heart Transplant ...

The largest to date multic-center trial investigating the use of a regimen involving everolamus and lowd dose tcrolamus in pediatric heart transplant.

1:02:41

5 key moments in this video    ⌄

## People also search for

Everolimus and **low-dose tacrolimus after** heart transpla...    🔍          **Tacrolimus vs** everolimus **vs sirolimus**    🔍

Everolimus **vs sirolimus**    🔍          Everolimus **vs tacrolimus**    🔍

1  2  3  4  5  6  7  8  9  10                    Next

Results are personalized - **Try without personalization**

**75243, Dallas, TX** - Based on your past activity - Update location

Help      Send feedback      Privacy      Terms

# EXHIBIT D

Case 3:26-cv-01882-K-BT     Document 3     Filed 06/05/26     Page 52 of 54     PageID 56

 An official website of the United States government
Here's how you know

FULL TEXT LINKS

 SpringerLink
FULL-TEXT ARTICLE

Review      Clin Pharmacokinet. 2004;43(2):83-95. doi: 10.2165/00003088-200443020-00002.

# Clinical pharmacokinetics of everolimus

Gabriele I Kirchner [1], Ivo Meier-Wiedenbach, Michael P Manns

Affiliations
PMID: 14748618   DOI: 10.2165/00003088-200443020-00002

## Abstract

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl chain substitution at position 40 on the sirolimus (rapamycin) structure. Everolimus, which has greater polarity than sirolimus, was developed in an attempt to improve the pharmacokinetic characteristics of sirolimus, particularly to increase its oral bioavailability. Everolimus has a mechanism of action similar to that of sirolimus. It blocks growth-driven transduction signals in the T-cell response to alloantigen and thus acts at a later stage than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and ciclosporin show synergism in immunosuppression both in vitro and in vivo and therefore the drugs are intended to be given in combination after solid organ transplantation. The synergistic effect allows a dosage reduction that decreases adverse effects. For the quantification of the pharmacokinetics of everolimus, nine different assays using high performance liquid chromatography coupled to an electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have been developed. Oral everolimus is absorbed rapidly, and reaches peak concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and steady-state peak and trough concentrations, and area under the concentration-time curve (AUC), are proportional to dosage. In adults, everolimus pharmacokinetic characteristics do not differ according to age, weight or sex, but bodyweight-adjusted dosages are necessary in children. The interindividual pharmacokinetic variability of everolimus can be explained by different activities of the drug efflux pump P-glycoprotein and of metabolism by cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system for everolimus biotransformation leads to drug-drug interactions with other drugs metabolised by this cytochrome system. In patients with hepatic impairment, the apparent clearance of everolimus is significantly lower than in healthy volunteers, and therefore the dosage of everolimus should be reduced by half in these patients. The advantage of everolimus seems to be its lower nephrotoxicity in comparison with the standard immunosuppressants ciclosporin and tacrolimus. Observed adverse effects with everolimus include hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections, thrombocytopenia and leucocytopenia. Because of the variable oral bioavailability and narrow therapeutic index of everolimus, blood concentration monitoring seems to be important. The excellent correlation between steady-state trough concentration and AUC makes the former a simple and reliable index for monitoring everolimus exposure. The target trough concentration of everolimus should range between 3 and 15 microg/L in combination therapy with ciclosporin (trough concentration 100-300 microg/L) and prednisone.

PubMed Disclaimer

## Related information

GEO Profiles
PubChem Compound

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GALLIT FISCHMAN

**(b)** County of Residence of First Listed Plaintiff **Dallas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gallit Fischman (Pro Se)
10114 Deermont Trail, Dallas, TX 75243
[214-893-6720] | [gallitfischman@yahoo.com]

## DEFENDANTS

NOVARTIS PHARMACEUTICALS CORPORATION

County of Residence of First Listed Defendant **Morris (NJ)**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

RECEIVED
JUN -5 2026
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☒ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | **LABOR** ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | Act ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | **IMMIGRATION** ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332 (Diversity of Citizenship)
Brief description of cause:
Wrongful death, pharmaceutical products liability and negligence.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
75.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
05/29/2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Gallit Fischman, Pro Se

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____



FROM GALLIT FISCHMAN
16114 Deermont Trail
Dallas, TX 75243

TO CLERK US District Court
1100 Commerce St Rm 1452
Dallas, TX 75242

RECEIVED
JUN - 5 2026

USPS TRACKING® #

9505 5102 6761 6153 8913 67

EXPECTED DELIVERY DAY: 06/04/26

Retail

U.S. POSTAGE PAID
PM
RICHARDSON, TX 75081
JUN 02, 2026

$11.95

RDC 03          1 Lb 12.70 Oz.          S2224E501030-97

UNITED STATES
POSTAL SERVICE®

TRACKED • INSURED

For Domestic and International Use

PRIORITY
MAIL®

Scotch™